UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

     v.

Neil Dexter

Criminal No. 19-cr-007-LM-01
Opinion No. 2022 DNH 059 P

**O R D E R**

On December 1, 2018, New Hampshire State Police Trooper Brian Gacek pulled over Neil Dexter after observing Dexter driving over the speed limit on I-95. During the stop, Gacek saw several suspicious items in Dexter's car, including balled-up cotton that appeared to have been pulled off the end of Q-tips and used as a filter for taking drugs intravenously.  Gacek questioned Dexter, ran the records of Dexter and his companions, and then ordered Dexter out of the car and continued to question him.  Gacek eventually impounded Dexter's car, and a few days later found drugs when he searched it pursuant to a warrant.

The government charges Dexter with possession of fentanyl with intent to distribute and conspiracy to possess with intent to distribute fentanyl.  21 U.S.C. §§ 846; 841(a)(1) and (b)(1)(A)(vi).  Dexter moves to suppress all evidence seized as a result of the search of his vehicle.  The government objects.  On March 22, 2022, the court held an evidentiary hearing.  For the reasons explained below, the court denies Dexter's motion.

## BACKGROUND

On December 1, 2018, sometime before 7:30 pm, Dexter was driving north on I-95. He drove a Toyota Corolla with Maine license plates. He had two companions with him: Amanda Davis sat in the passenger seat, and Angel Wilson sat in the backseat behind Dexter. As Dexter drove through the Hampton toll plaza, he saw a marked state police car parked nearby. He then saw the trooper pull out a few cars behind him and continue to follow him as he drove north.[1]

The first exit after the toll plaza is Exit 3 for Portsmouth. At that point, the speed limit drops to 55 miles per hour to account for an interchange with many entrance and exit ramps. The next exit (Exit 4) is on the left. Exit 4 is approximately seven miles after the Hampton toll plaza.

As Dexter drove past Exit 3 and entered the 55-mile-per-hour zone, he did not slow down. Gacek activated his radar and found that Dexter was traveling at 67 to 68 miles per hour. Dexter proceeded to take Exit 4 on the left, continuing at that speed. Gacek followed him and, after Dexter drove onto Exit 4, Gacek activated his emergency lights and pulled Dexter over.

Gacek approached Dexter's car from the passenger side—as is his practice when a car is stopped on the right-hand shoulder of a highway—because it is safer.

---

[1] Dexter did not testify at the evidentiary hearing. This fact comes from Dexter's written affidavit that he submitted with his motion to suppress. Gacek testified that he could not remember where he first saw Dexter's car but noted that he commonly sit at the Hampton tolls and watch cars go by. Because Dexter's assertion that Gacek pulled out at the Hampton tolls and followed him for seven miles does not contradict Gacek's testimony, the court credits this portion of Dexter's affidavit.

It was dark out, but Gacek could see well because of his hand-held spotlight and the light bar on his cruiser's windshield.

Gacek asked Dexter for his license and registration and asked if Dexter knew that the speed limit dropped at Exit 3.  Dexter answered that he did not know about the speed limit drop and produced the documents.  The car was registered to a woman who was not present in the car.  Because the owner was not present, Gacek also collected the two passengers' identifications so he would have a record of who was in the car in case it was later reported stolen.  Gacek asked Dexter "where are you coming from?" and "where are you headed?"  Dexter stated that the group had planned to go to the Square One Mall in Saugus, Massachusetts, because Davis had a gift card to Victoria's Secret.  Dexter told Gacek that they were unable to locate the mall and were heading home.  Davis—who was sitting between Gacek and Dexter in the passenger's seat—added that they were trying to visit her kids in Boston.  Gacek testified that the whole conversation took about a minute.

During that initial conversation, Gacek made several observations about the car and its occupants.  First, he noticed a single key in the ignition.  Instead of giving Dexter the whole keychain, the car's owner had apparently given Dexter only the car key itself.  Second, Gacek saw balled-up pieces of cotton on the floor of the backseat.  Gacek described that they looked like the cotton ends of a Q-tip had been pulled off, balled up, and used as a filter to inject drugs intravenously.  Gacek stated that the cotton wads he saw were gray and dirty, and looked as if they had been used.  Third, he noticed that Davis's teeth were "extremely rotted," consistent

3

with prior methamphetamine use.  Finally, he noted "movie theater size" bags of candy.

After the initial one-minute conversation, Gacek returned to his car and ran Dexter's and his passengers' records.  At 7:32 pm he ran Dexter's record.  Next, at 7:42 pm, he ran the vehicle registration, and at 7:46 pm he ran Davis's record. None of these checks revealed anything of note.  Dexter had no warrants, his license was clear, and the car's registration was valid.  Finally, at 8:08 pm, Gacek ran Wilson's record.  He learned that Wilson had been arrested earlier that day on an outstanding warrant and that she had also been charged with possession of narcotics.

Gacek returned to Dexter's car and asked Dexter to step out.  He pat-frisked Dexter, and then began asking Dexter in more depth about his travels that day. During the conversation, Dexter stated that he used to have a bad cocaine problem and that Davis used heroin and methamphetamine.  Gacek asked if there were any drugs in the car, and Dexter said that the women had "used him" and had picked up drugs.  Based on these statements, Gacek called for backup at 8:22 pm.

Over the next half hour, Gacek returned to the car and spoke with the two women.  When backup arrived, a female trooper ordered the two women out of the vehicle and pat frisked them.  Gacek ultimately impounded the car, and he later obtained a warrant to search the car based on what he learned during the traffic stop.  He found a kilogram of fentanyl in Wilson's purse.

## DISCUSSION

Dexter moves to suppress all evidence seized as a result of this traffic stop. He contends that Gacek violated his Fourth Amendment rights because (1) the initial traffic stop was not supported by probable cause that a traffic violation had occurred, and (2) even if the initial stop was justified, Gacek impermissibly extended the traffic stop without reasonable suspicion that Dexter was engaged in criminal activity. Dexter argues that the evidence subsequently found in his vehicle should be suppressed as fruit of the poisonous tree of the unlawful stop and extended detention.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The temporary detention of individuals by police during a traffic stop is a seizure under the Fourth Amendment. Brendlin v. California, 551 U.S. 249, 255 (2007). To ensure that all such seizures satisfy the Fourth Amendment's reasonableness requirement, the court engages in a two-step inquiry. United States v. Mouscardy, 722 F.3d 68, 73 (1st Cir. 2013). First, the court determines whether the seizure was justified at its inception. Id. Second, the court examines whether the "actions undertaken during the stop were reasonably related in scope to the stop itself unless the police had a basis for expanding their investigation." Id. (internal quotations and brackets omitted). Where, as here, the defendant challenges the constitutionality of a warrantless seizure, the government bears the burden of proving that the seizure was sufficiently limited in its scope and

5

duration.  See Florida v. Royer, 460 U.S. 491, 500 (1983); United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998).

I.      Initial Traffic Stop

A traffic stop is reasonable and properly justified at its inception if the officer has "probable cause to believe that a traffic violation has occurred."[2]  Whren v. United States, 517 U.S. 806, 810 (1996).  Courts in the First Circuit have held that even minor traffic violations can justify a traffic stop.  See, e.g., United States v. Dunbar, 553 F.3d 48, 55-56 (1st Cir. 2009) (initial stop justified based on officer's observation and video showing defendant's vehicle following another car too closely); United States v. Garcia, 53 F. Supp. 3d 502, 509-10 (D.N.H. 2014) (initial traffic stop justified based on officer's observation that vehicle crossed once over dashed line and once over solid fog line).

Dexter argues that Gacek lacked probable cause to stop the vehicle for two reasons.  First, he argues that the court should not credit Gacek's testimony that Gacek saw Dexter driving at 67 or 68 miles per hour in a 55 mph zone.  Second,

---

[2] The parties agree that probable cause is the appropriate standard.  See doc. no. 158 at 4; doc. no. 161 at 6-7.  The court acknowledges there is potentially inconsistent authority in the First Circuit about whether police can stop a car based on reasonable suspicion of a traffic violation, or whether they need the higher standard of probable cause.  Compare United States v. Reyes, 24 F.4th 1, 17 (1st Cir. 2022) (suggesting that probable cause is the standard) with United States v. Lawrence, 675 F. Appx. 1, 3 (1st Cir. 2017) (the standard is reasonable suspicion).  Because the court finds that even the higher standard of probable cause is met in this case, the decision of which standard applies is immaterial.

Dexter argues that even if he were travelling at 67 or 68 miles per hour, that is not a sufficient ground to pull him over.  Neither argument has merit.

Looking at Dexter's first contention, Dexter asserts that Gacek was lying about Dexter speeding.  Dexter acknowledges that a stop is lawful so long as the officer has an objectively reasonable basis for the stop.  See Wren, 517 U.S. at 813. Dexter argues, however, that Gacek found the car suspicious and manufactured a false justification (speeding) for the stop.  In support of his position that Gacek had no lawful basis for the stop, Dexter points out that Gacek attended various drug interdiction trainings, where he learned about indicators that might reveal a vehicle was being used to smuggle drugs.  Further, Dexter notes that Gacek followed Dexter for seven miles after the toll plaza before pulling him over.  And finally, he points out that Gacek never issued Dexter a speeding ticket, and that from the beginning of the stop Gacek seemed more interested in asking questions about Dexter's itinerary than he was in discussing speeding.  These facts, Dexter asserts, imply that not only was Gacek subjectively interested in ferreting out drug crime, but also that Gacek would fabricate a legal reason for the stop.

The court found Gacek credible in all relevant respects.  Moreover, neither Dexter nor his passengers testified.  The court therefore heard no evidence that Dexter was driving within the speed limit.  The court finds no reason to doubt Gacek's testimony regarding Dexter's speed.

Next, Dexter argues that even if he were travelling at 67 or 68 miles per hour, that does not necessarily establish a speeding violation because New

Hampshire's speed limits are presumptive and one can rebut them with an affirmative defense that one's speed was "reasonable and prudent."  RSA 265:60. This argument lacks merit.  The issue is whether Gacek had probable cause of a speeding violation, not whether Dexter would be guilty of a speeding violation. Travelling over the presumptive speed limit is probable cause of a speeding violation.  See Amatucci v. Chase, No. 17-CV-237-JL, 2018 WL 10878064, at *5 (D.N.H. Dec. 26, 2018) ("[I]f a police officer [in New Hampshire] reasonably determines that a person is driving at a rate of speed higher than the posted speed limit, that officer has probable cause to stop the car and cite the driver with the offense of speeding.").

      In sum, the court finds that Gacek had probable cause that Dexter committed a traffic violation and therefore the stop was lawful at its inception.

## II.    Extension of the Traffic Stop

      Next, the court examines whether Gacek extended the stop beyond its lawful purpose.  "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and to attend to related safety concerns."  Rodriguez v. United States, 575 U.S. 348, 354 (2015) (citation omitted).  Because the purpose of the stop is addressing the traffic violation, the stop may "last no longer than is necessary to effectuate that purpose."  Id. (brackets omitted).  Accordingly, police authority for the seizure expires "when tasks tied to the traffic infraction are—or reasonably

should have been—completed." Id.  Unrelated investigations are permissible only if they do not prolong the stop or if they are independently supported by reasonable suspicion of criminal activity.  Id. at 355; Illinois v. Caballes, 543 U.S. 405, 409 (2005).

An officer's "mission" during a traffic stop is multifaceted: it includes determining whether to issue a warning or ticket, inquiries related to highway safety, and inquiries related to officer safety.  See Rodriguez, 575 U.S. at 355-56. The first purpose—determining whether to issue a warning or ticket—is straightforward.  The latter two inquiries, regarding highway safety and officer safety, require some explanation.

First, as to highway safety, the Rodriguez court stated that an "officer's mission includes ordinary inquiries incident to the traffic stop."  Id. at 355 (internal quotations and brackets omitted).  "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  Id. These checks are permissible because they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."  Id.  A warrant check on a driver furthers this objective by determining whether the apparent traffic violator is wanted for one or more previous traffic offenses.  Rodriguez, 575 U.S. at 355.

A limited number of questions about travel plans, too, fall into this category of ordinary inquiries related to highway safety.  Though the Rodriguez court did not

specifically include itinerary questions as an example, it did—albeit elsewhere in

the opinion—cite to a Tenth Circuit case that discussed itinerary questions.  Id.

(citing United States v. Holt, 264 F.3d 1215, 1221-22 (10th Cir. 2001) (en banc),

overruled on other grounds as recognized in United States v. Stewart, 473 F.3d

1265, 1269 (10th Cir. 2007).  There, the Tenth Circuit explained that "travel plans

typically are related to the purpose of a traffic stop because the motorist is traveling

at the time of the stop.  For example, a motorist's travel history and travel plans

may help explain, or put into context, why the motorist was weaving (if tired) or

speeding (if there was an urgency to the travel)."  Holt, 264 F.3d at 1221; see also

Wayne R. LaFave, 4 Search & Seizure § 9.3(d) (6th ed.) (discussing itinerary

questions).

        This sentiment echoes First Circuit cases decided before Rodriguez.  In

United States v. Chhien, the First Circuit upheld the search in a traffic stop where

the officer "pos[ed] a few prosaic questions about the appellant's itinerary: where he

and his passenger had been, where they were going, and whether they had stopped

along the way."  266 F.3d 1, 9 (1st Cir. 2001).  The court noted that such "routine

questioning" was common during highway stops.  Id.  The First Circuit

distinguished such an inquiry from "pointed questions about a serious crime

unrelated to the original violation," which would raise concerns about abuse of

authority.  Id.; see also Dunbar, 553 F.3d at 56 (itinerary questions permissible

where no indication the questioning "rose beyond the routine").

The second permissible set of mission-related inquiries concerns officer safety.  See Rodriguez, 575 U.S. at 356.  As with questions concerning highway safety, such inquiries also "stem[] from the mission of the stop itself."  Id.  Because traffic stops are "especially fraught with danger to police officers, . . . an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely."  Id. at 356 (citation omitted).

To determine whether an officer safety precaution is justified, courts employ a balancing test.  For example, in Pennsylvania v. Mimms, the Court held that once an officer has lawfully stopped a vehicle for a traffic violation, the officer may order the driver to get out of the car.  434 U.S. 106, 111 n.6 (1977).  The Court reasoned that the government's "legitimate and weighty" interest in officer safety outweighed the "de minimis" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle.  Id. at 110-11.  In Maryland v. Wilson, the Court held that the Mimms balancing test applies not only to the driver, but to passengers as well.  519 U.S. 408, 414 (1997).  The Court explained that "[w]hile there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal."  Id.

As an example of what other practices the officer safety rationale might justify, the Supreme Court in Rodriguez cited Holt, which noted that officer safety justified conducting a criminal record check to determine if the driver had any outstanding warrants or prior criminal history.  Rodriguez, 575 U.S. at 356 (citing Holt, 264 F.3d at 1221-22).  On the officer safety side of the balance in that case, the

Tenth Circuit noted that a record check can appraise an officer "of whether the detained motorist might engage in violent activity during the stop." Holt, 264 F.3d at 1222. On the individual interest side, the court stated that detention during a record check would only last a "short period." Id. at 1221.

In sum, during a traffic stop an officer may spend time determining whether to write a citation, conduct "ordinary inquiries" related to the safety of the vehicle and its driver and take certain "negligibly burdensome" precautions related to officer safety. See Rodriguez, 575 U.S. at 355-56.

An officer may only extend the stop beyond those bounds if he develops reasonable suspicion of additional unlawful activity. Reasonable suspicion is more than a naked hunch, but "obviously less demanding than . . . probable cause" and "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989). Courts determine whether reasonable suspicion existed "in a commonsense, case-by-case way, taking in the whole picture." United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017) (citation omitted). A car stop is "is not necessarily a snapshot of events frozen in time and place, but rather more closely resembles an ongoing process." Id. (internal quotation omitted). Thus, an officer's actions must be "fairly responsive to the emerging tableau," meaning the officer can "increase the scope of his investigation by degrees when his suspicions grow during the stop." Id. at 125 (citation and internal quotations omitted).

With this legal landscape in mind, the court analyzes two segments of the stop: Gacek's initial questioning while he collected the occupants' identifications, and the more than 30 minutes Gacek spent in his vehicle conducting record checks. For each of these segments, the relevant inquiries are threefold: (1) were Gacek's actions reasonably related in scope to the purpose or "mission" of the stop; (2) if not, did those actions "prolong—i.e., add time to—the stop"; and (3) if yes, was the additional time supported by reasonable suspicion of criminal activity?  See Rodriguez, 575 U.S. at 353-56.

A.    Initial questions after the stop

To begin with, Dexter argues that the time Gacek spent questioning Dexter about his travel plans initially after stopping the car was impermissible because it bore no relation to a stop for speeding and prolonged the stop.  Dexter is wrong.

First, this initial inquiry did not prolong the stop at all.  Gacek testified that the whole interaction was "very short," that it took "give or take" one minute, and that as a matter of course these initial conversations only last as long as it takes for Gacek to collect licenses and registration.  Second, this questioning was an "ordinary inquir[y] incident to the traffic stop."  Rodriguez, 575 U.S. at 355 (brackets omitted);  see also Chhien, 266 F.3d at 9 ("a few prosaic questions" about a driver's itinerary are permissible).  Gacek asked Dexter the "standard questions of where are you coming from, where are you headed."  Dexter explained that the group was coming back from looking for the Square One Mall, because Davis had a

gift card to Victoria's Secret.  Davis added that they were trying to visit her kids in Boston.  These limited questions "are related to the purpose of the traffic stop because the motorist is travelling at the time of the stop."  Holt, 264 F.3d at 1220-21.  This inquiry was well within the bounds of what a driver expects during a traffic stop.  There was no Fourth Amendment violation at this stage.

> B.    Record checks of Dexter and the two passengers

Next, Dexter argues that it was outside the mission of the stop for Gacek to conduct record checks of not only Dexter, but also Davis and Wilson.  Because these checks took in total more than 30 minutes (more than 20 of which were spent on the passengers), Dexter argues that this prolonged the stop.  The court agrees that the record checks of the passengers prolonged the stop but finds that this additional time was supported by reasonable suspicion.

In essence, Rodriguez, makes clear that officers may not prolong a motor vehicle stop any longer than necessary to resolve the reason for the stop unless they have reasonable suspicion.  575 U.S. at 348-49.  Here, Gacek's inquiries about the car's registration, Dexter's license, and his criminal record were part of the stop's "mission" because Gacek stopped the car for speeding and Dexter was the driver of the car.  At that point, the "mission" of the stop was over and Gacek could have given Dexter a speeding ticket or a warning, or simply let him drive away.  Gacek did not do that.  Instead Gacek prolonged the stop for an additional 20 minutes so he could run checks on the two passengers.  Even before Rodriguez, the law in the

First Circuit did not permit inquiries of this length related to passengers under similar circumstances.  See United States v. Henderson, 463 F.3d 27, 46-47 (1st Cir. 2006) (15-minute inquiries related to passenger not permitted).

To be more specific: record checks of the driver and the car itself are justified by both highway safety and officer safety concerns.  Rodriguez, 575 U.S. at 355-56. As to highway safety, absent a reason to impound the vehicle, the officer generally allows the driver to go on his way.  Thus, checking the driver's license and the status of the vehicle serves the objective of enforcing the traffic code by "ensuring that vehicles on that road are operated safely and responsibly" including determining "whether the apparent traffic violator is wanted for one or more previous traffic offenses." Id. at 355.  As to officer safety, a criminal record check of a driver can be a "negligibly burdensome precaution[]," id. at 356, that helps an officer discern "whether the detained motorist might engage in violent activity during the stop." Holt, 264 F.3d at 1222.

Record checks of a passenger differ because they are justified only by officer safety, and not highway safety.  Rodriguez allows officer safety precautions that are "negligibly burdensome." 575 U.S. at 356.  The Supreme Court has not specifically addressed the issue of passenger record checks, but the reasoning in First Circuit cases (from both before and after Rodriguez) is consistent with Rodriguez.  Because the passengers are not driving, inquiring into their backgrounds or driving records is not related to highway safety.  If the inquiry is negligibly burdensome, it could be

related to officer safety because it helps an officer discern whether the passengers "might engage in violent activity during the stop." Holt, 264 F.3d at 1222.

First Circuit cases from both before and after Rodriguez shed light on what amount of time for an inquiry into a passenger could be considered "negligibly burdensome." Id. Where an officer spends only a minute or two asking a passenger questions about his or her identity, the First Circuit has held that such inquiries were "negligibly burdensome" because they did not measurably prolong the stop. See United States v. Clark, 879 F.3d 1, 4-5 (1st Cir. 2018) (one minute of follow-up questions to passenger to confirm his name and date of birth was "negligibly burdensome"); United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2019) ("initial inquiries into [passenger's] identity took at most a minute or two and did not measurably extend the duration of the stop"); United States v. Fernandez, 600 F.3d 56, 61-62 (1st Cir. 2010) (request for passenger's identification and record check were permissible because they did not "measurably extend the duration of the stop").

In contrast—even before Rodriguez—the First Circuit found that where an officer spent between 10 and 15 minutes running a criminal history check on the passenger (and a few minutes longer after that to confirm the results of the check with the dispatcher), the check measurably extended the stop. Henderson, 463 F.3d at 46. The court noted that there was no particularized reason to launch into an investigation of the passenger, and it stated that the "standard procedure in the circumstances . . . would have been to issue a citation to [the driver], arrange to

16

have the car towed, and let the driver and passenger leave the scene." Id. at 46.

Henderson is consistent with post-Rodriguez caselaw because extending a stop by

15 minutes is not "negligibly burdensome."

Gacek's conduct in this case was not "negligibly burdensome" and falls

outside what the First Circuit found impermissible in Henderson. The timeline of

the record checks is important. First, at 7:32, Gacek ran Dexter's record. At 7:42,

he ran the car's registration. These checks were permissible based on both highway

safety and officer safety concerns. See Rodriguez, 575 U.S. at 355-56.

At 7:46, Gacek ran Davis's record. Gacek's last query was around 8:08, when

he ran Wilson's record. These inquiries into the two passengers extended the stop

by more than 20 minutes. Twenty minutes is longer than the approximately fifteen-

minute record check in Henderson, which the First Circuit found impermissibly

prolonged the stop. See 463 F.3d at 46. As in Henderson, the time Gacek took to

check the passengers' records was outside the bounds of the stop's "mission" and

prolonged the stop.

The court next looks at whether this additional time was supported by

reasonable suspicion. The government argues that the following facts comprise

reasonable suspicion: the pieces of pulled cotton, the candy, Davis's teeth, the single

ignition key, and Davis and Dexter's allegedly inconsistent answers about their

travel plans for the day. These specific and articulable facts—particularly the

pulled cotton swabs on the floor of the backseat—establish reasonable suspicion

that the group was engaged in criminal activity.

In assessing whether an officer had reasonable suspicion, the court may not engage in a "divide-and-conquer analysis" that scrutinizes each factor in isolation. United States v. Arvizu, 534 U.S. 266, 274 (2002).  Rather, the court must consider the "totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing."  Id. at 273 (internal quotation marks omitted).  Even if an individual factor could be innocuous in other situations, there are "circumstances in which wholly lawful conduct might justify the suspicion that criminal activity [is] afoot."  Sokolow, 480 U.S. at 9.  "Indeed, Terry itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.'"  Id. (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)).

The reasonable suspicion analysis "entails a measurable degree of deference to the perceptions of experienced law enforcement officers."  Dion, 859 F.3d at 124 (internal quotation marks and citations omitted).  Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  Arvizu, 534 U.S. at 273 (internal quotations and citation omitted).  While showing deference to law enforcement, the court's inquiry must remain objective. See Dunbar, 553 F.3d at 55. The court's focus is not the officer's subjective beliefs or intentions, but, rather, "what a reasonable officer in his position would have thought."  United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007).

In applying a common-sense, totality-of-the-circumstances analysis, the court places the most weight on the pieces of pulled cotton that Gacek saw on the floor of the backseat.  Gacek testified that intravenous drug users use this type of cotton as a filter when injecting drugs.  He explained that a user would put the drugs in either a spoon or a bottle cap and dissolve them in water, then put the piece of cotton in the water and use it as a filter while drawing the liquid drugs into a needle.  The cotton Gacek saw in Dexter's car was dirty and gray, as if it had already been used.  He stated that it did not look like typical cotton balls one might buy at a drug store to remove nail polish.  Rather, the cotton pieces were small, like they had been removed from the ends of Q-tips.

Giving deference to Gacek's experience, the court finds that it was reasonable to infer that the cotton was indicative of drug use.  Unlike a regular, intact Q-tip or a cotton ball, small dirty pieces of pulled cotton such as this are not typically connected with any lawful activity.  Compare State v. Frazier, No. 18-COA-006, 2018 WL 5278948, at *3 (Ct. App. Ohio Oct. 22, 2018) (tiny cotton swabs, some stained brown, contributed to probable cause) with United States v. Owens, 2:20-cr-00041-JDL, 2021 WL 2939935, at *9 (D. Me. July 13, 2021) (regular Q-tip did not support reasonable suspicion when it was clean, the cotton ends had not been pulled off, and driver stated that she kept a box of Q-tips in car's glove box to use for hygienic purposes).

On the other hand, the court finds that the other factors add little to the analysis.  As to the single ignition key, Gacek testified that it was indicative of

19

Dexter being a drug courier.  Gacek testified that in his experience, drug kingpins do not hand out a set of keys (with their housekeys on them) to their runners for fear the runners will rob their homes.  While that may be true, in assessing reasonable suspicion, a court must use its common sense.  Dion, 859 F.3d at 124 (explaining that courts assess reasonable suspicion "in a commonsense, case-by-case way, taking in the whole picture").  Unlike the pieces of cotton Gacek saw on the floor of the car, the court has little difficulty imagining innocent explanations for the single key—and much difficulty finding it constitutes objective evidence of criminality.

Nor does the court put much stock in the purportedly inconsistent stories, the passenger's decayed teeth, or the bags of candy.  Upon questioning about their itinerary, Dexter stated that group had travelled to Massachusetts planning to visit the Square One Mall.  Davis then added that they were trying to visit her kids in Boston, even though Gacek had not directly questioned her.  This may be slightly unusual, but given that Davis sat between Dexter and Gacek, her comment was likely in addition—not in contradiction—to Dexter's account.  As to the passenger's teeth, the court views this factor with caution, because an individual could have poor teeth for many years after recovering, and signs of prior drug use alone cannot justify a search.  And finally, the bags of candy are hardly probative of drug activity.

But given Gacek's experience, he understood that the pieces of pulled cotton (removed from the ends of Q-tips) are used as a filter to draw drugs into a needle. There was no other explanation for these swabs.  Dexter challenged only Gacek's

credibility as to the pieces of cotton, noting that Gacek neither photographed them nor included them on the inventory.  Gacek did, however, include a description of his observations of the cotton in his police report.  Ex. 1 at 11.  And, as the court explained, Gacek testified credibly.  Without these incriminating cotton pieces, Gacek's other observations would have added up to nothing more than an "inchoate and unparticularized suspicion or 'hunch.'"  See Sokolow, 490 U.S. at 7.  However, the court finds that Gacek's testimony about the cotton pieces supports a reasonable inference of potential drug activity that warranted his further investigation.

Gacek's initial observations thus justified extending the stop for more than 20 minutes to run the passengers' records.  At the end of that period, Gacek ran Wilson's record and learned that she had been arrested earlier that day on an outstanding warrant and that she had also been charged with possession of narcotics.  That fact gave Gacek added justification to further prolong the stop by ordering Dexter out of his car and continuing to question him.  "As the investigation proceeds, . . . the officer 'may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.'" United States v. Rudiaz, 529 F.3d 25, 29 (1st Cir. 2008).  During the questioning when Dexter was out of the car, he stated that the women had "used him" and picked up drugs.  At this point in the stop, Gacek had probable cause that justified impounding the car and, later, searching it pursuant to a warrant.

**CONCLUSION**

In sum, Gacek measurably extended the stop beyond its mission when he spent more than 20 minutes running the records of the two passengers.  See Rodriguez, 575 U.S. at 354.  That additional time was permissible, however, because it was separately supported by reasonable suspicion that criminal activity was afoot.  See Terry, 392 U.S. at 30.  The small balled up pieces of pulled cotton—combined with the other factors—allowed a reasonable inference that the occupants of the car were engaged in drug-related activity.  Dexter's motion to suppress (doc. no. 158) is therefore denied.

SO ORDERED.

Landya McCafferty
United States District Judge

May 4, 2022

cc:  Counsel of Record
     U.S. Probation
     U.S. Marshal